UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
THOMAS MICKENS,

                Petitioner,

    -against-

UNITED STATES OF AMERICA,

                Respondent.
----------------------------------X

<u>MEMORANDUM & ORDER</u>
97-CV-2122(JS)

APPEARANCES:

For Petitioner:    Robert N. Isseks, Esq.
                6 North Street
                Middletown, NY 10940

                Stephen R. Kahn, Esq.
                Law Offices of Stephen R. Kahn
                433 North Camcen Drive, Suite 888
                Beverly Hills, CA 90210

                Christopher Tritico, Esq.
                4300 Scotland
                Houston, TX 77095

For Respondent:    Cecil Carusi Scott, Esq.
                United States Attorneys Office
                Eastern District of New York
                One Pierrepont Street, 14th Floor
                Brooklyn, NY 11201

SEYBERT, District Judge.

      Petitioner Thomas Mickens ("Petitioner" or "Mickens") moves, pursuant to Federal Rule of Civil Procedure 60(b), to vacate his prior conviction or, in the alternative, for relief from Judge Thomas C. Platt's denial of his habeas petition. For the reasons set forth below, Petitioner's motion is DENIED.

<u>BACKGROUND</u>

      Petitioner Thomas Mickens was the orchestrator of a

cocaine distribution conspiracy originating in Queens, New York during the mid-late 1980s. In 1989, after a four month trial, Mickens was convicted of sixteen counts, including conspiracy to distribute cocaine, money laundering, tax evasion and illegal structuring of transactions. (R. at 327.) Petitioner was tried with three other Co-Defendants: (1) Shelby Kearney ("Kearney"); (2) Norvell Young ("Young"); and (3) Bettina Celifie ("Celifie"). Only Defendant Young was acquitted of all charges.

Petitioner was sentenced to 35 years imprisonment and ordered to pay a fine of $1 million and a special assessment of $800. His conviction was affirmed by the Second Circuit, see U.S. v. Mickens, 926 F.2d 1323 (2d Cir. 1991) ("Mickens I"), and the Supreme Court denied certiorari. See Mickens v. U.S., 502 U.S. 1060, 112 S. Ct. 940, 117 L. Ed. 2d 111 (1992).

Approximately five years later, Mickens filed a petition for a writ of habeas corpus ("Petition") pursuant to 28 U.S.C. § 2255. Initially, the Petition was dismissed on procedural grounds. The Second Circuit reversed the district court's determination, reinstated the Petition and remanded the matter back to the district court for further proceedings. U.S. v. Mickens, 148 F.3d 145 (2d Cir. 1998) ("Mickens II"). After remand, the Petition was dismissed for failure to allege the deprivation of any constitutional right. See Mickens v. U.S., 53 F. Supp. 2d 326 (E.D.N.Y. 1999) ("Mickens III"). Petitioner's request for a

2

certificate of appealability was denied by both the district court and the Second Circuit.

In September 2003, Petitioner filed the instant motion, pursuant to Rule 60(b), seeking to vacate his prior conviction or, in the alternative, for reconsideration of the district court's denial of his habeas petition. The basis of Petitioner's motion is his belief that Mr. Robert Simels ("Simels"), the attorney who represented Petitioner at the criminal trial, received a plea offer from Assistant United States Attorney Kirby Heller ("AUSA Heller"), yet failed to convey the offer to Petitioner. This argument was raised in Petitioner's original habeas application and his request for a certificate of appealability, but was rejected because Petitioner did not possess any evidence indicating that such a plea offer had been made. At the time, Simels' position was that he did not receive a plea offer from the Government, and the Government was unable to locate any evidence of a plea offer having been extended to Petitioner.

The impetus for the Rule 60(b) motion was the discovery of an October 27, 1988 letter ("Plea Letter") from AUSA Heller to all defense counsel, memorializing a "global plea" offer extended to Petitioner and Defendants Kearney, Young, Celifie, George Jenkins and Anthony Jacobs. (Gov't's Ex. 10.)[1] The Plea Letter

---

[1] Defendants Jenkins and Jacobs avoided trial by pleading guilty to all charges against them in the Superseding Indictment.

detailed the specific counts of the Superseding Indictment to which each Defendant would accept a plea and established an acceptance deadline of November 4, 1988. (Id.) Because the plea offer was "global," the Defendants had to accept the offer unanimously, or not at all.[2]

Based on the newly discovered Plea Letter, Judge Platt, in an Order dated August 25, 2004, granted Petitioner an evidentiary hearing pursuant to Rule 60(b). See Mickens v. U.S., 333 F. Supp. 2d 44, 48-49 (E.D.N.Y. 2004) ("Mickens IV").[3] The purpose of the hearing was "to determine whether [Petitioner] received ineffective assistance of counsel from Mr. Simels at the plea-bargaining stage of his case, if and when his attorney failed in his duty to communicate to his client a plea offer extended by

---

[2] After numerous Freedom of Information Act ("FOIA") requests, the Plea Letter was discovered by Petitioner's friend, Donna Ruff. (See Pet'r's Ex. H; Tr. at 196-201.) Little has been proffered to explain why the letter eluded the Government's (and the Petitioner's) discovery for so long. The letter was docketed as part of the original record in the criminal case, so it was attainable by all. The only explanation for the delayed discovery was aptly pointed out by Petitioner's counsel on the initial habeas application: the placement of such correspondence on the criminal docket is highly unusual — so unusual that he did not even think to look there. (Tr. at 104-05.)

[3] In the August 2004 Order, Judge Platt explained that the Rule 60(b) motion was not precluded by the rule against successive habeas petitions because it related to the integrity of the § 2255 proceeding, not Petitioner's criminal conviction. See Mickens IV, 333 F. Supp. 2d at 48-49; see also Gonzalez v. Crosby, __ U.S. __, __ S. Ct. __, __ L. Ed. 2d __, 2005 WL 1469516 at **4-6 (June 23, 2005); Harris v. U.S., 367 F.3d 74, 77 (2d Cir. 2004).

the Government." Id. at 50.

The evidentiary hearing ("Hearing") was conducted by this Court[4] on April 18-19, 2005. The Court received testimony from the following witnesses: (1) Petitioner; (2) Petitioner's brother, Frank Mickens; (3) Simels; (4) AUSA Heller; (5) Donna Ruff; (6) Ronald Rubinstein, attorney for Defendant Jacobs; (7) Jonathan Shapiro, Petitioner's counsel with respect to the initial habeas application; and (8) John Pollok, Petitioner's counsel on appeal from the judgment of conviction.

DISCUSSION

I.    Standard of Review[5]

    A.    Rule 60(b)

Petitioner's 60(b) motion is most accurately characterized as an application for relief from a prior order based on newly-discovered evidence. See Mickens IV, 333 F. Supp. 2d at 48 n.3; Fed. R. Civ. P. 60(b)(2). In order to set aside a prior order pursuant to Rule 60(b)(2), the movant must demonstrate that: "(1) the newly discovered evidence was of facts that existed at the

---

[4]    Due to the acrimonious relationship between Judge Platt and Simels that developed during Petitioner's criminal trial, Judge Platt recused himself from this matter. The matter was then reassigned to this Court.

[5]    Because Judge Platt concluded that Petitioner's 60(b) motion was permissibly filed as an attack on the integrity of the prior habeas proceeding, see supra n.3, the Court is constrained to review the application only as a motion for reconsideration of the denial of the habeas petition (rather than, as Petitioner requests, a Rule 60(b) motion to vacate his prior conviction).

time of trial or other dispositive proceeding, (2) the movant . . . [was] justifiably ignorant of [such facts] despite due diligence, (3) the evidence [is] admissible and of such importance that it probably would . . . change[] the outcome, and (4) the evidence [is] not . . . merely cumulative or impeaching." <u>U.S. v. Int'l Bhd. of Teamsters</u>, 247 F.3d 370, 392 (2d Cir. 2001) (quoting <u>U.S. v. Int'l Bhd. of Teamsters</u>, 179 F.R.D. 444, 447 (S.D.N.Y.1998)).

The only issue before this Court is whether the Plea Letter, in connection with the other evidence adduced at the Hearing, alters the prior determination concerning Petitioner's Sixth Amendment ineffective assistance of counsel claim.

B.  <u>Ineffective Assistance Of Counsel</u>

A "[d]efendant suffers a Sixth Amendment violation when he receives ineffective assistance of counsel." <u>Pham v. U.S.</u>, 317 F.3d 178, 182 (2d Cir. 2003). In order to prevail on his ineffective assistance claim, the Petitioner must establish that "counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland v. Washington</u>, 446 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

It is well established that "a defendant suffers a Sixth Amendment injury where his attorney fails to convey a plea offer." <u>Pham</u>, 317 F.3d at 182. However, the failure to communicate a plea

6

offer, by itself, does not warrant a finding of ineffective assistance. Proof of failure to communicate a plea offer only satisfies the first prong of the Strickland test.

In order to satisfy the prejudice prong of Strickland, a defendant alleging an uncommunicated settlement offer must establish, through some objective evidence, that if they had received the plea offer, they would have accepted it. See Muyet v. U.S., No. 01-CV-9371, 2004 WL 1746369 at *8 (S.D.N.Y. Aug. 3, 2004). A defendant, therefore, may not rely simply upon his own "self-serving statements" that he would have accepted the plea offer. Pham, 317 F.3d at 182.

Objective factors that tend to corroborate or refute whether a defendant would have accepted a plea offer include the defendant's continued protestations of innocence, and the disparity between the maximum sentence under the plea offer and the sentence received after trial. See Pham, 317 F.3d at 182 (recognizing sentencing disparity as an objective factor to be used to corroborate whether a defendant would have accepted a plea); U.S. v. Perez Gomez, No. 98-CV-109, 2003 WL 22119123 at *6 (D. Conn. Aug. 29, 2003) (recognizing that protestations of innocence are probative of acceptance of a plea). With respect to sentencing disparities, the Second Circuit has noted that "a significant sentencing disparity in combination with defendant's statement of his intention is sufficient to support a prejudice finding." Pham,

317 F.3d at 182. But this does not present an absolute rule. Where other objective factors indicate that acceptance was not likely or impossible, a defendant's prejudice claim may still fail. See Perez Gomez, 2003 WL 22119123 at *6 (recognizing that other objective factors may outweigh a significant sentencing disparity, requiring a finding that a defendant would not accept a plea offer).

## II. Analysis

Petitioner contends that he has satisfied the Strickland criteria because the Government extended a plea offer to Simels, the offer was never conveyed to Petitioner, and Petitioner would have accepted the plea offer had he been aware of its existence. According to Petitioner, Simels did not inform him of the plea offer because Simels wished to amass enormous legal fees during trial.

The Government argues that Petitioner has failed to satisfy either of the two Strickland criteria because: (1) Petitioner cannot demonstrate that Simels failed to convey any plea offers extended by the Government; and (2) even if Simels failed to convey a plea offer to Petitioner, Petitioner cannot establish that he would have accepted it. The Court considers each argument in turn.

### A. Simels' Failure To Communicate The Plea Offer

Based upon the record of Petitioner's § 2255 Petition and

the evidence adduced at the Hearing, the Court can reach only one conclusion: Simels received a plea offer from AUSA Heller and did not communicate it to Petitioner.

As explained in the credible testimony of Jonathan Shapiro ("Shapiro," Petitioner's original habeas counsel), prior to the discovery of the Plea Letter, Simels' position was that he never received any plea offer with respect to Petitioner. (See Pet.'s Ex. F; Tr. at 101-03); see also Mickens IV, 333 F. Supp. 2d at 45. At the Hearing, however, Simels' position was more qualified: he denied any recollection as to whether a plea offer had been extended to Petitioner. (Tr. at 126-27.) Simels added that "I convey all plea offers to all clients made by the government." (Id. at 129; see also Id. at 150-51.) The testimony, which may be fairly characterized as carefully vague, permitted an inference that, if a plea offer was extended, Simels would have conveyed it to Petitioner.

In contrast to Simels' memory of the plea offer, his recollection for other details at the Hearing was rather sharp. For example, while Simels was unable to recall any plea offer being extended to his client, his recollection of a conversation concerning Petitioner's purported desire to accept a plea was quite specific — Simels testified that such a conversation never took place. (Tr. at 128.) Further, despite testifying that he was unable to recall how much he earned from representing Petitioner,

or the manner in which he was paid (Id. at 134-35, 182), Simels had particularized recollections with respect to the payment scheme for John Pollok, Petitioner's appellate attorney. (Id. at 180-81, 183.) Specifically, Simels testified that he had listened to Pollok's testimony about his fee arrangement with Petitioner, and that Pollok's recollection of the facts was "faulty to say the least." (Id. at 181.)

Based upon Simels' vague testimony concerning the existence of a plea offer, and considering the other testimony and evidence adduced at the Hearing, the Court finds credible Petitioner's assertion that Simels never advised him of the global plea offer. In reaching this conclusion, the Court rejects the Government's multiple, appealing arguments as to why Simels would never have withheld a plea offer from Petitioner.

The Government points out that Simels, as a high profile criminal defense attorney, would have "little to gain" and much to lose by concealing the plea offer from Petitioner. Doubtless, Petitioner was one of Simels' most high profile clients. If news had spread that Simels was keeping plea offers from Petitioner, it would certainly have a meaningful, negative impact on Simels' lucrative defense business. Thus, Simels had a lot to lose if this conduct was discovered. In addition, the plea offer was global and was communicated to all other Defendants, rendering it quite possible that Simels' alleged concealment of the offer would be

detected. The Government notes that certain of Petitioner's Co-Defendants, Jacobs and Jenkins, were desirous of accepting a plea and could have exposed Simels' actions to Petitioner. When these circumstances are juxtaposed with the short-term benefit of the trial fees Simels ostensibly envisioned when he opted to conceal the plea agreement, the Government's position is quite alluring.

The argument, however, is short on facts. The Government's conjecture as to Simels' plausible motivations (or lack thereof) does not remedy Simels' inability to testify with any precision concerning the plea offer. The Court is troubled by Simels' amended position with respect to whether a plea offer was extended or not. Specifically, the Court fails to see why, if Simels (as he testified to at the Hearing) was uncertain or did not recall whether any plea offer was extended to Petitioner, he would represent to Shapiro, affirmatively, that no such offer was ever made. When Simels was given an opportunity to explain his statements to Shapiro, he simply averred that he could not recall the conversation. (Tr. at 182-83.) In light of the foregoing, the Court places little reliance upon Simels' averment that if he received any offer, he would have conveyed it to Petitioner.

In contrast, Petitioner has not wavered from his insistence that he never received notice of the plea offer from Simels. (Tr. at 269.) The Court does not intend to depict Petitioner as a bastion of credibility, but the Government does

11

little to impeach his veracity on this point. Rather, the majority of the Government's attacks on Petitioner's credibility concern separate issues: whether Petitioner assiduously sought to take a plea, and whether Petitioner was truly at the mercy of Simels' manipulation and decision-making throughout the representation. But neither fact impacts Petitioner's credibility concerning his ignorance of the plea offer — and such facts certainly have no bearing upon Simels' duty to disclose the plea offer. The decision to accept a plea offer is "ordinarily the most important single decision in any criminal case," <u>Boria v. Keane</u>, 99 F.3d 492, 496-97 (2d Cir. 1996), and counsel's candor with the defendant in this context is imperative.

Finally, there is evidence indicating that immediate pecuniary motives may have actually influenced Simels' decision-making. Two particular events, when viewed together, are noteworthy. First, Simels assisted Petitioner in executing a power of attorney in the name of an alias, "Thomas Harris," in favor of his brother Frank Mickens. (Tr. at 188-90.) The power of attorney permitted Frank Mickens access to two safety boxes located at Trustmark National Bank in Jackson, Mississippi. (Ex. 13, 14.) In connection with the execution of the power of attorney, Simels signed an affidavit stating that he knew the man before him signing the power of attorney to be "Thomas Harris." (Ex. 13; Tr. at 188-190, 218.) Simels, however, testified at the Hearing that he knew

the true identity of the man who signed the document to be Thomas Mickens but he was aware that "Thomas Harris" was one of Petitioner's aliases. (Tr. at 188-90.)

This conduct, standing alone, would not permit any meaningful inference of a suspect pecuniary motive. However, when viewed within the context of Simels' subsequent trip to Jackson, Mississippi, the conduct becomes more troubling. At the Hearing, the Court heard testimony concerning a trip that Mr. Simels took to Jackson in late 1988/early 1989. (Tr. at 116-18, 136-38, 175-77.) During the trip, Simels met with Petitioner's brother, Frank Mickens. It is clear that one of the reasons for the trip was to collect funds to pay Simels' fees. (Tr. at 138, 140, 175-76.) Further, it is apparent that some of the funds were retrieved from safety deposit boxes located at Trustmark National Bank - the subjects of the Power of Attorney executed by Simels. (Tr. at 90, 137, 175-76, 177, 188-90; R. at 369-70.) The two events, when viewed together, raise the specter that Simels may have been willing to compromise his ethical obligations in an effort to be paid.[6]

---

[6] After the trial, Judge Platt referred Simels to the Eastern District's Grievance Committee and, pending the Committee's determination, suspended Simels from practicing in his Court. (R. at 366-73.) The Grievance Committee Referral cited numerous potential bases for disciplining Simels; among these was Simels' alleged involvement in the removal of funds from the Trustmark National Bank safe deposit boxes. The Referral noted that the funds contained in the safety deposit boxes were allegedly hidden proceeds gained from drug

13

Based on the foregoing, the Court finds that the Government extended a plea offer to Simels, but Simels, for some reason, failed to convey the offer to Petitioner. Accordingly, Petitioner has suffered a Sixth Amendment injury. See Pham, 317 F.3d at 182. The Court now examines whether Petitioner suffered any prejudice as a result of Simels' deficient performance.

B.  <u>Whether Petitioner Would Have Accepted The Plea Offer</u>

Not surprisingly, Petitioner asserts that, had he been aware of the global plea offer, he would have accepted it. (Tr. at 233-34.) Petitioner relies upon this assertion and the disparity in length between the sentence he received and the guidelines sentence that would have been imposed under the global plea agreement in order to establish prejudice. See Pham, 317 F.3d at 182.

The Government advances numerous reasons why Petitioner is unable to establish prejudice. First, the Government contends that Petitioner cannot establish a disparity in length between the plea offer sentence and the actual sentence because the nature of the second count offered in the Plea Letter is unclear. Second, the Government posits that, due to the global nature of the plea agreement, even if Petitioner wanted to, he could not have accepted the plea offer. Third, the Government asserts that Petitioner's assertions that he would have accepted the plea offer are

---

distribution.  (R. at 369.)

disingenuous. Finally, the Government argues that Petitioner, based upon his own admissions at the Hearing, could not have accepted the plea offer because it would have required him to commit perjury before a federal district judge.

### 1. Ambiguities In The Plea Letter

The Plea Letter provides, in pertinent part, that in order to accept his portion of the global plea offer, Petitioner would have to accept a plea on two counts — Count "5, [and the] equivalent of [C]ount 10 in superseding information." Count 5 charges that, on March 11, 1998 Petitioner "and George Jenkins did knowingly and intentionally distribute cocaine, a Schedule II narcotic drug controlled substance." (Gov't's Exs. 2-4 at 3.) The specifics of the second count are unclear. No Superseding Information was filed in the criminal action, and AUSA Heller testified that she has no recollection as to what the second count refers to. (Tr. at 79.)

The Government contends that the inability to precisely define the second count renders Petitioner incapable of establishing any objective disparity between the plea offer sentence and the sentence imposed. According to the Government, because Petitioner bears the burden of establishing the objective facts indicating that he would have accepted the plea offer, his motion must fail.

As structurally sound as the Government's argument may

be, the Court refuses to force Petitioner to shoulder the burden for the Government's shortcomings. The pertinent facts concerning the plea offer have, at all times, been within the Government's control. Until recently, the Government erroneously denied the plea offer's existence, and now attempts to compound its prior error by relying upon the ambiguities in the Plea Letter and the stale recollections of AUSA Heller to defeat Petitioner's claim. Adherence to the Government's position on this issue would reward sloppy drafting and inadequate record-keeping, and the Court will not do so.

The Government's failings, however, do not provide Petitioner with an opportunity to simply pick a charge out of thin air. There must be some reliable indicia as to the nature of the second count. Here, Petitioner requests that the Court construe the second count to be the same as the "Count 10" contained in each of the three Superseding Indictments that the Government filed in the criminal action: a 1997 tax evasion charge. (See Exs. 2-4.)

But a review of the objective facts renders this position less than reliable. Petitioner was, indisputably, the orchestrator of the criminal conduct referenced in the Superseding Indictment; he was the first-named defendant, and the primary target of the twenty-three charges contained therein. It strains credulity to believe that Petitioner's plea offer would be as favorable as that extended to any of his Co-Defendants. Yet that is what Petitioner

16

suggests.

Petitioner's maximum sentence for Count 5 would have been twenty years.  See 21 U.S.C. §§ 841(a)(1),(b)(1)(C).  The maximum sentence for Count 10, if it were a tax evasion charge, would have been five years.  See 26 U.S.C. § 7201.  Putting aside, for the moment, any pertinent Guidelines calculations, Petitioner's maximum sentence exposure under the plea offer would have been twenty-five years.  Defendant Jacobs, an indisputably lesser but not insubstantial player in the charged conspiracy, was offered a plea to Counts "3 [and] 7."  Count 3 was a drug sale charge, similar to Count 5.  Jacobs' maximum sentence exposure with respect to Count 3 would also have been twenty years.  Count 7 was a Section 371 charge for conspiracy to defraud the United States Government, relating to numerous underlying offenses.  (See Gov't's Exs. 2-4.) The maximum sentence for Count 7 would have been five years.  Thus, Jacobs' maximum sentence exposure under the plea offer would also have been twenty-five years.  The Court finds it extremely unlikely that the two Defendants would have been offered, in essence, the same plea.

This presents a troubling issue.  Indeed, there is little compelling evidence supporting any precise definition as to the nature of the second count.  The plea offer was extended over 15 years ago, its terms incorporate a non-existent document, and the recollections of the individuals involved are hazy, at best.  That

17

the determination may be difficult, however, does not require the Court to abdicate its duty to decide the merits of Petitioner's application. The Court reaches a conclusion based upon a preponderance of the evidence standard, mindful that the burden of proof rests with Petitioner. See Glick v. U.S., No. 97-CV-3905, 1998 WL 315065 at *5 (E.D.N.Y. June 11, 1998) ("It has long been established that the movant in a Section 2255 proceeding bears the burden of proof of establishing by a preponderance of the evidence that he is entitled to relief.")

After probing the Record, the Court finds that the second count offered to Petitioner referred to a money laundering charge. In reaching this conclusion, the Court primarily relies upon two facts. First, the apparent strength of the Government's money laundering case renders it unlikely that Petitioner would have been offered such a favorable second count. (Tr. at 84-85.) Second, the Court is persuaded by the logic inherent in AUSA Heller's testimony that, had the Government offered Petitioner a plea to charges that were contained in the then-existing indictment, such as Section 371 conspiracy or tax evasion, then the Government would have simply referred to those charges specifically in the Plea Letter. (see Tr. at 69, 75.) There would have been no need for any restrictions or caveats. The only charge that would have made any sense was a money laundering charge.

## 2.    Sentencing Disparity

The Court now assesses the disparity between the maximum sentence pursuant to the terms of the Plea Letter and the sentence Petitioner actually received.    See    Pham, 317 F.3d at 182.

As explained above, the maximum sentence for Count 5 would have been twenty years.    See 21 U.S.C. § 841(b)(1)(C).    The maximum sentence for the money laundering count would also have been twenty years.    See 26 U.S.C. § 7201.    Thus, Petitioner's total sentence exposure under the plea offer would have been forty years. Petitioner's sentence exposure under the Sentencing Guidelines, however, would have been substantially less.

The 1988 Federal Sentencing Guidelines would govern Petitioner's sentencing under both counts.    With respect to Count 5, Petitioner's total offense level would have been 20, providing for a sentence between 51 and 63 months.    This calculation is based on Petitioner's criminal history category of IV,    his role as orchestrator (R. at 327-61), the quantity of cocaine involved (Tr. at 295), and Petitioner's acceptance of responsibility pursuant to the plea.

Petitioner's total offense level for the money laundering charge would have been 30, corresponding to a sentence of anywhere between 135 and 168 months.    This figure is arrived at by consulting the Petitioner's pre-sentence report ("PSR").    The PSR indicates two separate offense levels for the separate money

19

laundering counts: level 30 for the violation of 18 U.S.C. § 1956(a)(1)(B)(ii) (knowing participation in a financial transaction designed "to avoid a transaction reporting requirement under state or federal law"); and level 32 for the violation of 18 U.S.C. § 1956(a)(1)(B)(i) (knowing participation in a financial transaction designed to conceal the proceeds of specified unlawful activity). As Petitioner has failed to affirmatively demonstrate which money laundering account was applicable, the Court utilizes the higher of the two ranges, and reduces that amount by 2, due to Petitioner's "would be" acceptance of responsibility.

Presuming consecutive sentences under each Count, Petitioner's maximum sentence under the global plea offer would have been 231 months, or 19 and 1/4 years. This figure, for the purpose of prejudice analysis, is appropriately compared to the sentence Petitioner received from Judge Platt - 35 years imprisonment. See Pham, 317 F.3d 182-83 (comparing the "high end of the government's plea offer" with the defendant's "sentence after a trial conviction").

There is no magic formula to use in determining whether a disparity between sentences is "significant." Indeed, for a purportedly objective criteria, the term is seemingly prone to subjective assessment. In Pham, the Second Circuit found a significant disparity where the plea offer was for 78-97 months and the sentence received after trial was "210 months, which [was] more

20

than double." 317 F.3d at 183. "More than double," however, is not required. See U.S. v. Gordon, 156 F.3d 376, 378, 381 (2d Cir. 1998) (finding significant disparity where attorney rendered errant advice as to sentence exposure of 120 months, and sentence after conviction was 210 months).

Here, the Court finds the fifteen year disparity between the two sentences to be significant. The actual sentence was almost double the maximum under the plea offer. In light of Petitioner's age (twenty-four years old) at the time the offer was extended, the difference between a sentence of nineteen and thirty-five years is, undoubtedly substantial. (Tr. at 324.)

The determination of a significant disparity, however, carries little objective weight where, as here, other objective facts indicate that the defendant would never have been capable of actually accepting the plea. Cf. Perez Gomez, 2003 WL 22119123 at *6 (finding that other factors, including defendant's protestations of innocence, "significantly outweigh[ed] the sentencing disparity and demonstrat[ed] the lack of 'objective evidence that [defendant] would have accepted the plea agreement").

3.   The Global Plea Offer

At the Hearing, the Court heard testimony that certain of Petitioner's Co-Defendants, Jacobs and Jenkins, were inclined to accept a plea. (Tr. at 70) There was also testimony concerning Co-Defendants Kearney and Celifie, indicating that the two were not

21

interested in accepting a plea.  (<u>Id.</u>)  The Government argues that Petitioner's failure to proffer evidence indicating that each of the Co-Defendants would have accepted the global plea offer is fatal to his prejudice claim.  The Court agrees.

The nature of a global plea is that it must be accepted by all defendants, or it cannot be accepted by any.  Thus, Petitioner's averments that he would have accepted the plea offer only carry him so far.  Where the plea offer is global, a defendant asserting prejudice from counsel's deficient representation with respect to the plea offer must either introduce objective facts indicating that the other co-defendants were inclined to accept the offer, or that offer was not truly global.  <u>See</u> <u>Pham</u>, 317 F.3d at 184 (recognizing that the potential unwillingness of co-defendants to accept a global plea is not probative where the "government did not enforce the 'global' provision of its offer").  In other words, a defendant must establish that all that essentially remained was his willingness to accept.  Otherwise, it cannot be said that there was a "reasonable probability" that counsel's failure to convey the offer would have changed the outcome.  <u>See</u> <u>Strickland</u>, 446 U.S. at 694.

The instant case presents the clearest example of why this must be the rule.  At the Hearing, Ronald Rubinstein testified concerning his representation of Defendant Jacobs in the Mickens case.  (Tr. at 33-35.)  Rubinstein testified that Jacobs was

22

interested in accepting a plea offer, and would have been interested in accepting the offer contained in the Plea Letter, but was unable to do so because not everyone was "on board" with accepting the global plea. (Tr. at 35, 42-44, Gov't's Ex. 9.)[7] If it were simply a matter of Jacobs' desire to accept the offer, he could have taken advantage of the terms contained in the Plea Letter or negotiated some other settlement. Instead, Jacobs was denied the benefit of any plea offer, and later pled guilty to all charges against him in the Superseding Indictment. (Tr. at 44-46.)

While Jacobs' efforts to accept the Plea Letter offer were obviously frustrated by Petitioner's failure to receive notice of the proposed deal, there were other Co-Defendants who, apparently, were not interested in accepting a plea. The Court heard testimony that the Government sought pleas from both Defendant Celifie and Defendant Kearney, but that neither was interested. (Tr. at 70.) Additionally, Defendant Young was tried and acquitted of all charges.

Petitioner cites no objective facts indicating that these Defendants (Kearney, Celifie, Young) were inclined to accept the Plea Letter offer. Petitioner's averment that he would likely have

_____

[7]     There is a typographical error on page 35 of the Court's copy of the transcript of the proceeding. While the transcript indicates that Rubinstein testified that everyone "was on board" with the global plea, it is apparent form the Court's contemporaneous record taking from the Hearing, and the context of Rubinstein's statement that the transcript should read that everyone "was not on board" with the global plea.

been able to get the remaining Co-Defendants to accept the offer is self-serving, (Tr. at 326; but see Tr. at 302), and is belied by his continuous protestations that he wished to take on all criminal responsibility to save his friends. (Tr. at 213, 314-15, 336.) Further, Petitioner's assertion that Simels' failure to inform him of the offer precluded any assessment of whether all Co-Defendants would accept the offer, (Tr. at 326), is countenanced by his ability to proffer sufficient objective facts concerning the desire of Jacobs and Jenkins to accept the offer.

Nor does Petitioner proffer any evidence indicating that the Government would not enforce the global aspect of the offer. See Pham, 317 F.3d at 184. To the contrary, based on the experiences of Defendants Jacobs and Jenkins, it is apparent that the Government intended to enforce the global plea by its terms.

Because of the global nature of the plea offer and the apparent disposition of certain of Petitioner's Co-Defendants to proceed to trial, the Court finds that Petitioner has failed to prove that he would have been able to accept the plea offer contained in the Plea Letter. Such finding is fatal to Petitioner's claims of prejudice, and requires denial of his Rule 60(b) motion.[8]

---

[8] Because the Court concludes that Plaintiff has failed to demonstrate that, even if he wanted to, he would have been able to accept the plea offer, the Court need not pass on the merits of the Government's remaining objections.

The Court notes, however, that there is ample reason to

## CONCLUSION

For the reasons set forth above, Petitioner's motion pursuant to Rule 60(b) for relief from Judge Platt's Order denying his application pursuant to 28 U.S.C. § 2255 is DENIED.

Dated: Central Islip New York
       August 17, 2005

                                        SO ORDERED

                                        /s/ JOANNA SEYBERT
                                        Joanna Seybert, U.S.D.J.

---

question the credibility of Petitioner's insistence that he would have accepted the terms of the Plea Letter if they were made known to him. First, Petitioner testified that he would have accepted a plea of even thirty-five years - the duration of the sentence he received after trial. The Court finds it difficult to understand why a defendant in Petitioner's situation, with the benefit of knowing the actual sentence that he would have received after an unfavorable trial, would accept a plea to that sentence and forego a chance at acquittal. Second, Petitioner's proffered motivation for accepting a plea - a desire to martyr himself for the sake of his friends - would have been undermined by the very acceptance of the global plea offer. Pursuant to the terms of the global plea, all Defendants, including those Petitioner wished to protect, would be required to admit to criminal charges and face prison time.